Binns et al., Appellants, *v.* Copper
Range Company.

Argued May 16, 1939. Before KEPHART, C. J., SCHAF-
FER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Gilbert Cassidy, Jr.,* for appellants.

*Yale L. Schekter,* with him *James S. Clifford, Jr.,* and
*MacCoy, Brittain, Evans & Lewis,* for appellee.

258

Opinion by Mr. Justice Maxey, June 19, 1939:

Plaintiffs filed a bill of complaint in which they averred that on September 17, 1936, they were the owners in the aggregate of 12,000 shares of common stock of C. G. Hussey & Company (a Pennsylvania corporation) ; that defendant, the Copper Range Company (a Michigan corporation), owned more than a majority of the voting stock of the Hussey Company, thereby exercising control over it; that F. W. Paine was Treasurer and Director of defendant company and also of the Hussey Company and was the person through whom defendant dominated and controlled the Hussey Company; that on August 3, 1936, Paine had a conference with E. H. Binns, husband of Cecelia K. Binns, one of the plaintiffs herein, and the father of the other plaintiffs; that at this conference Paine made certain false representations to Binns as to the business and prospects of the Hussey Company and as to his intentions in regard thereto, and offered to purchase the common stock of the Hussey Company owned by plaintiffs for $10 per share; that Paine intended that Binns should convey these representations to plaintiffs and that Binns did so convey them; that in reliance on said representations, plaintiffs sold to defendant their 12,000 shares of common stock of the Hussey Company for $10 a share; and that in reality the common stock of the Hussey Company was in fact worth $76.40 per share. Plaintiffs prayed that defendant be required to account to them for all moneys, profits and benefits received by it upon the common stock in excess of $120,000.

Defendant in its answer averred that the purchase price paid for the 12,000 shares of common stock of the Hussey Company owned by plaintiffs was $11.33⅓ per share; that Paine made no representations to Binns in regard to the business or prospects of the Hussey Company, or as to his intentions in regard thereto, and that as a matter of fact, E. H. Binns and the Binns family

had as full information as to the business of the Hussey Company as did F. W. Paine.

After final hearing the court below made numerous findings of fact and conclusions of law and decided the bill should be dismissed. This appeal followed.

Among the findings of fact are these: On August 3, 1936, Paine and Binns met in the office of the Hussey Company in Pittsburgh. There Paine offered to purchase all or part of the 12,000 shares of common stock of the Hussey Company owned by the Binns family for $10 per share. Binns held out for a higher price. Finally, Paine agreed to pay $10 per share for the stock and a bonus of $16,000 to E. H. Binns, so as to bring the price theretofore paid to Binns and his family for said stock up to an average of $10 per share. There was no conversation at this meeting other than Paine's offer, Binns' request for a higher price and Paine's counter offer. Binns conveyed Paine's offer to plaintiffs and the same was discussed at a family meeting on September 13, 1936, at which all of the plaintiffs were present except H. Kenelm Binns. The decision of plaintiffs was to accept Paine's offer, which acceptance was communicated by Binns to Paine immediately. On September 17, 1936, the 12,000 shares of common stock of the Hussey Company owned by plaintiffs were transferred to defendant, and defendant paid to plaintiffs $120,000 and paid E. H. Binns $16,000. Plaintiffs had full knowledge of this payment made to Binns. Plaintiffs at the time of the sale were all of age, the youngest, W. H. Binns, being thirty years of age. Binns at the time was seventy years of age, in full possession of his faculties, experienced in business affairs, with an intimate knowledge of the business of the Hussey Company, dating back at least thirty-eight years. The court found further: "At the time of the sale plaintiffs knew of the prior sales of the common stock of C. G. Hussey & Company by their father and the prices paid therefor; had

in their possession correct financial statements of C. G. Hussey & Company as of December 31, 1930; knew that the surplus of said company was $367,000; that the book value of said stock was approximately $28 per share; knew that the profits for the year 1930 had been $129,000, and that the profits for the first six months of the year 1931 had been $225,000." On October 1, 1936, defendant converted its 40,000 shares of preferred stock of the Hussey Company into 40,000 shares of common stock of that company. Immediately after this conversion, the Directors of the Hussey Company declared a dividend upon the common stock of $1.00 per share. This was the first dividend ever paid upon that stock. On November 23, 1936, the Directors of the Hussey Company declared a dividend of $2.00 per share upon the common stock of that company, and on December 2, 1936, they declared a dividend of $.40 per share upon this common stock. The court further found that early in November, 1936, the officers of defendant consulted counsel concerning the undistributed profits tax and its effect upon defendant and the Hussey Company. Counsel advised the officers of defendant that the financial set up of these two companies was such that a merger was advisable. Meetings of directors and stockholders of the two corporations were held and a merger was effected, whereby the 59,000 shares of common stock of the Hussey Company owned by defendant company were cancelled and the minority stockholders in the Hussey Company, owning 6,000 shares of common stock, received common stock of the defendant, Copper Range Company, for their stock of the Hussey Company at the ratio of 2½ shares of defendant stock for one share of Hussey stock. At the time of the merger the common stock of defendant company was selling at $12.50 per share, and no dividend has been paid thereon since the merger. The capital stock of the Hussey Company was never listed on any stock exchange and there was no ready market therefor, other

than by selling to defendant and persons associated with defendant. Plaintiffs at the time of the sale of their stock to defendant were under no pressure, economic or otherwise, and would not have sold the stock had they not believed that it was for their best interest to do so.

The court below in its adjudication said: "Plaintiffs make four complaints about the conduct of Mr. Paine: (1) that he represented that the 'stock was worth $10 a share,' and that this representation was false; (2) that he stated that it would be necessary for C. G. Hussey & Company to use all of its surplus and to borrow $300,000 for improvements, and that no money was borrowed and no improvements were made; (3) that he said that no dividends would be paid, and that dividends actually were paid shortly after the transaction was concluded; (4) that he did not inform plaintiffs that there was to be a merger. We have found the facts to be that Mr. Paine (1) never made any representation in regard to the value of the Hussey Company stock; (2) never made any statement about borrowing money or making improvements; (3) never said that no dividends would be paid; and (4) at the time the offer was made, had no knowledge or expectation that there would be a merger. The facts are fatal to plaintiffs' claim, but the law is as fatal as the facts."

The facts found by the chancellor and approved by the court in banc, are supported by evidence and must be accepted. See *Belmont Laboratories Inc. v. Heist*, 300 Pa. 542, 151 A. 15; *Kratz v. Allentown*, 304 Pa. 51, 155 A. 116.

As to the alleged misrepresentations of the value of the stock of the Hussey Company, Mr. Binns himself testified: Mr. Paine "said they would offer $10 a share for that stock. I said I did not consider that that was the right price for it, that it was surely worth more. He said: 'No, it was not worth any more than $10 a share and that was as much as they would pay for it.'" Mr.

Paine denied that he ever said that the stock was worth only $10 a share. He said: "I never made any representation of value. There was not any occasion to represent value." Mr. Binns had been familiar with the company. Binns' testimony, even if uncontradicted, would scarcely sustain the allegation as to deceptive misrepresentation of value, for it must be noted that Binns had owned and managed the Hussey Company from 1898 to 1931. When it was incorporated in 1931 he became a director. When E. H. Binns resigned in February, 1936, his son, Sidney, one of the plaintiffs, succeeded him and served until September, 1936. E. H. Binns' son, Winfield, testified that he had "numerous jobs of one kind or another" with the Hussey Company. He added: "I finally had charge of one department, selling, managing that particular department for four years." E. H. Binns and each member of his family received at the annual February meeting each year, a copy of the audit report prepared by Lybrand, Ross Bros. & Montgomery, certified public accountants. An attorney was present at the stockholders' meeting in February, 1936, as proxy for Mrs. Binns. E. H. Binns testified: "My own impression was from what little I could learn that the stock had a book value of something like $28.00 a share." On October 27, 1935, he wrote to Mr. Paine, as follows: "As you are aware, the book valuation of the common stock has greatly increased and is now worth several times your figure of $8.00 per share. This in conjunction with the low price of former sales to you, prompts me to ask that you reconsider and make me a more inviting offer."

From 1933 to February, 1936, E. H. Binns had negotiated with Paine and sold him 13,000 shares of this stock at prices varying from $7.50 to $10 per share. Binns was present at the directors' meeting on August 3, 1936, which was the day he received the offer from Mr. Paine for the 12,000 shares, and heard the President report the result of operations for the first six months

of 1936. It is obvious that Mr. Binns had as great an opportunity as Mr. Paine to judge the value of the stock in question.

As to plaintiff's allegation that Mr. Paine made false representations that the Hussey Company would use its surplus and would need to borrow $300,000 for improvements, the chancellor specifically found to the contrary. There was evidence to support the chancellor's findings. Paine denied that he had said anything as to the necessity for borrowing $300,000 and using it and the surplus to make improvements. Binns on cross-examination admitted that despite the fact (alleged by him) that Paine made statements about spending a large sum of money for improvements, he, Binns, did not ask what a single one of those improvements might be that was in contemplation. This admission on his part justified the court in accepting Paine's testimony that nothing was said about these allegedly huge borrowings.

Binns' testimony about Paine's statement that no dividends would be paid was not accepted by the chancellor, and after reading the record on this phase of the case, we find that the chancellor was fully justified in his finding that Mr. Paine never said that no dividends would be paid.

The court below concluded as a matter of law that there was no fiduciary or confidential relationship existing between Paine and the plaintiffs. As to this, we agree with what the court in banc said in its opinion dismissing the exceptions: "The plaintiffs concede that the general rule supported by the decided weight of authority and followed in Pennsylvania holds that the mere fact that a purchaser of shares from an individual shareholder is an officer or director of the company whose shares he purchases, does not of itself in the absence of special circumstances create a fiduciary relationship between them as to this sale of stock. The duty of an officer or director is owed to the corporate entity and not to the shareholder as an individual. . . .

The plaintiffs endeavor to bring this case within the exception to the general rule and argue that a confidential relationship did exist because of 'special circumstances.' It is not clear of what these circumstances consist. The plaintiffs apparently consider the power of control possessed by the defendant corporation as a majority stockholder in a closed corporation sufficient to make this case an exception. In this connection special emphasis is placed upon facts occurring after the sale of the plaintiffs' stock, namely, the declaration of dividends and the merger of the Hussey Company and Copper Range Company. The chancellor found that at the time the offer was made, Paine, as agent of the defendant, had no knowledge or expectation that there would be a merger, nor did he ever state that a dividend would not be declared. . . . Furthermore, the attorney for the Copper Range Company testified that his office suggested the distribution of earnings in November, 1936, to escape the federal undistributed profits tax. That recommendation was feasible because of the corporate holdings after the purchase. The defendant was a mining company which could charge off large amounts for depreciation to counter-balance the large earnings of the Hussey Company in 1936, of which earnings the plaintiffs were fully informed. Since the defendant owned most of the stock after the merger, a declaration of dividends would not impair the cash balance of the Hussey Company. There were only 6000 shares outstanding so that the dividends amounted to approximately $20,000. Retention of earnings would result in a tax of approximately $50,000."

On the question of the value of the stock the court in banc pertinently said: "Moreover, the most important factor affecting value was the common knowledge of the plaintiffs, namely, the earnings of the corporation. They were aware that the company earned approximately one quarter of a million dollars for the first six months of 1936. They were also aware of the past earnings of the

company. Nevertheless, the plaintiffs' argument completely ignores earnings as a factor in affecting value and exaggerates the importance of a subsequent merger which the evidence indicates emanated from the company's attorney after the sale of the stock, and was motivated by the effect of taxes upon the position of both companies and which has not been shown to have materially affected values."

The case of *Moore et al. v. Steinman Hardware Company*, 319 Pa. 430, 179 A. 565, is applicable here. In that case plaintiff filed a claim sounding in deceit, whereby she alleged that the president of defendant company, a brother of plaintiff's decedent, had made fraudulent misrepresentations to her in procuring, in defendant's behalf, the sale to it of decedent's shares. This court sustained the action of the court below in holding that "the representations alleged were such matters of opinion that they were not actionable under the circumstances. . . . Statements of value are but a part of the 'trade talk' and bargaining which customarily accompany negotiations for the sale of property. It has many times been pointed out that a buyer or seller is not entitled to rely on such statements where he has an equal opportunity to ascertain the facts affecting the value of the thing to be sold. . . . Nor is there merit in the contention that plaintiffs did not have equal opportunity to discover the facts relating to the value of the shares. As owners of a majority of the shares they controlled the corporation, upon whose assets the value of the shares depended. Obviously the corporate books and records were available to them for the purpose of determining that value. In any case, their status as shareholders clearly entitled them to an examination of the books in order to determine the value of their shares in connection with the proposed sale [citing cases]." Likewise, in *Klerlein v. Werner*, 307 Pa. 16, 160 A. 719, this court held that a mere assertion of value when no warranty is intended is not grounds for relief, because

the assertion is a matter of opinion, and especially is this true where the one supposed to rely on such statement has an equal opportunity to ascertain the facts on which such opinion may be based.

The case of *Bailey v. Jacobs*, 325 Pa. 187, 189 A. 320, cited by appellants, is wholly inapplicable to the facts in this case. We held there that "because defendant made profits from his personal use of the corporate funds, and because the patents and patent rights purchased by him were highly desirable for the Paper Company's purposes, he must account accordingly." In the opinion in that case it was pointed out that defendant purchased certain assets with money belonging to the two companies of which he was president and that he transferred them to a Delaware corporation which he organized, and in return he received the entire capital stock of the new company. That was not a case where one stockholder bought out the stock holdings of another stockholder.

The court below was clearly justified in its holding that there was no fiduciary relationship involved.

In the instant case the burden is upon appellants to satisfy this court that there was no evidence to support the facts found by the chancellor and affirmed by the court in banc. This burden the appellants have not met.

The decree is affirmed at appellants' cost.