Donald L. FORBIS, and Judith E. Forbis d/b/a Ansata Arabian Stud, Plaintiffs,

v.

Barbara REILLY, Defendant.

Civ. A. No. 85–2404.

United States District Court, W.D. Pennsylvania.

April 28, 1988.

Melvin L. Moser, Jr., Buchanan Ingersoll, Pittsburgh, Pa., for plaintiffs.

Leonard W. Yelsky, Yelsky & Lonardo Co., L.P.A., Cleveland, Ohio, for defendant.

## OPINION

GERALD J. WEBER, District Judge.

This suit arises from several transactions in which plaintiffs sold to defendant 3 pure-bred Arabian horses. Plaintiffs sued for payment of balance due on 2 sales and defendant countersued with charges of fraud. Plaintiffs have filed a motion for summary judgment and defendant responded. The parties have submitted lengthy deposition transcripts, other evidentiary materials and briefs. After a review of the record we conclude that there is no disputed issue of fact on any of the three transactions and summary judgment in favor of plaintiffs on all issues is appropriate.

## FACTS

We begin with a brief outline of the transactions between the parties. A more detailed description of each transaction is reserved for the discussion of each transaction below.

As early as 1979, Mrs. Reilly purchased 2 Arabian horses. The horses were owned for enjoyment, not breeding and Mrs. Reilly describes her interest at that time as "passive". In the following years Mrs. Reilly purchased other horses, including several Arabians, and became interested in establishing a breeding farm for purebred Arabian horses.

To this end, over a period of years, Mrs. Reilly attended various seminars on all aspects of the business, read books and trade publications, consulted several persons knowledgeable in the field, struck up a

relationship with a consultant in the field and enlisted him to travel with her, hired a professional trainer, attended Arabian horse shows and auctions, and began visiting Arabian horse farms all over the country.

In 1982 Mrs. Reilly began building her breeding stock in purebred Arabian horses of the Egyptian strain. Early in that year she attended an auction, unaccompanied, and purchased a broodmare. She also learned of another mare available at the farm of Judy Forbis.

Mrs. Forbis and her husband own and operate a breeding farm in Arkansas known as Ansata which specializes in the Egyptian strain. Mrs. Forbis has spent 25 years in the business of breeding Arabian horses and she has published several books and numerous magazine articles on Arabian horses.

In November, 1982, Mrs. Reilly visited Ansata and purchased Il Shirin, a broodmare in foal, for the sum of $30,000. The horse was owned by another breeder but boarded at Ansata. Mrs. Forbis acted as agent for the seller and signed the sales agreement in that capacity.

In April 1983, Mrs. Reilly returned to Ansata to examine 2 colts owned by Mrs. Forbis. She wanted to buy a colt to develop as a breeding stallion. She chose to purchase Ansata Abu Halim from Mrs. Forbis for $150,000. Soon thereafter, on June 11, 1983, Mrs. Reilly purchased a broodmare, Ansata Nahema, from Mrs. Forbis for $157,000.

Il Shirin lost the foal she was carrying at the time of sale and, despite repeated efforts to impregnate her, she never again bore a foal to term. As Ansata Abu Halim matured, certain defects appeared and another defect failed to abate, allegedly making the horse useless for breeding. Because of the dissatisfaction with these two horses, Mrs. Reilly stopped making payments on Ansata Abu Halim. She also ceased payments on Ansata Nahema, though she had no complaints about that horse.

Plaintiffs sued to recover the balance due on the sales agreements for Ansata Abu Halim and Ansata Nahema. On plaintiffs' petition and after a hearing we permitted plaintiffs to repossess Ansata Nahema upon posting a $300,000 replevin bond. Mrs. Reilly has asserted a counterclaim, seeking to rescind the sale of Ansata Abu Halim, and to recover damages related to Ansata Abu Halim and Il Shirin. The gravamen of the counterclaim is that Mrs. Forbis made fraudulent misrepresentations which induced Mrs. Reilly to purchase Il Shirin and Ansata Abu Halim.

## DISCUSSION

### 1) Il Shirin

We begin chronologically with the first transaction between the parties, the subject of Count III of the Counterclaim. Mrs. Reilly alleges that Mrs. Forbis made fraudulent representations which induced Mrs. Reilly to purchase Il Shirin. Mrs. Reilly seeks to recover the $30,000 purchase price plus the costs of breeding, feeding and caring for the horse.

Mrs. Forbis was not a party to this contract of sale. Il Shirin was owned by Count Federico Zichy–Thyssen and Mrs. Forbis acted solely as his agent pursuant to a written power of attorney. She signed the sales agreement in her capacity as agent. Mrs. Reilly concedes that at the time of the transaction she was aware of the owner's identity and the agency status of Mrs. Forbis.

An agent who acts for a disclosed principal is generally not liable on the contract. E.g. *Vernon D, Cox & Co., Inc. v. Giles*, 267 Pa.Super. 411, 406 A.2d 1107, 1110 (1979), and cases cited therein.[1] However, an agent who fraudulently induces the other party to enter the contract may be personally liable for damages caused by that party's reliance on the fraud. See, *Deak-*

---

1. There is arguably a choice of law problem here, Mrs. Forbis being from Arkansas, Mrs. Reilly being from Pennsylvania, and the transactions having been consummated in Arkansas. However neither party has addressed the question and in the absence of proof that the law of another jurisdiction is different and applicable, we employ the law of the forum state.

tor v. Fox Grocery Co., 332 F.Supp. 536 (W.D.Pa.1971); *National Cash Register Co. v. Modern Transfer Co.*, 34 Leh. L.J. 518, 526, (1972). Mrs. Reilly's counterclaim is not based on the contract, but on alleged fraudulent misrepresentations made by Mrs. Forbis which induced Mrs. Reilly to buy Il Shirin. We will examine the alleged misrepresentations to determine if they satisfy the prerequisites for such a claim.

To prevail on a claim of fraudulent misrepresentation a party must establish that the statement was false when made, and that the declarant either knew it was false or acted in reckless disregard for the truth. *Delahanty v. First Pennsylvania Bank, N.A.*, 318 Pa.Super 90, 464 A.2d 1243 (1983). Also, an innocent misrepresentation may be actionable when special circumstances impose on the declarant a duty to ascertain the truth. *Shane v. Hoffmann*, 227 Pa.Super. 176, 324 A.2d 532 (1974).

■ We look then to the misrepresentations allegedly made by Mrs. Forbis. First of all, Mrs. Reilly alleges that Mrs. Forbis stated repeatedly that Il Shirin was very reasonably priced, much cheaper than most purebred Arabian mares. In her deposition, in the very next breath, Mrs. Reilly admits that from her own knowledge of prices in the industry, Il Shirin was cheaply priced (B. Reilly depo. at p. 29). In any event opinions of value or quality are ordinarily not actionable as fraud. *Binns v. Copper Range Co.* 335 Pa. 257, 6 A.2d 895 (1939); *United States v. Goldberg*, 158 F.Supp. 544 (E.D.Pa.1958); *Berkibile v. Brantly Helicopter Corp.*, 462 Pa. 83, 103, 337 A.2d 893 (1975).

Of course Il Shirin is not worth $30,000 if she cannot breed and Mrs. Reilly claims that Mrs. Forbis indicated that Il Shirin was capable of producing a foal. To prevail, Mrs. Reilly must establish that this statement was false when made, i.e., that Il Shirin was infertile at the time of sale.

■ It is undisputed that at the time of sale Il Shirin had recently produced a colt who was priced at $10,000, and that she was again in foal to an Ansata breeding stallion. Only after the sale did Il Shirin lose the foal she carried. As provided in the sales agreement Mrs. Forbis then bred Il Shirin to an Ansata stallion six times over the next 9 months, with only a nominal service charge to Mrs. Reilly. After efforts at Ansata failed, Mrs. Reilly brought Il Shirin to the Reilly farm for further efforts. Only after a year of breeding Il Shirin did Mrs. Reilly conclude that the mare was barren.

It is clear on this record that Mrs. Reilly cannot establish that Il Shirin was infertile at the time of sale. To the contrary the horse had just produced one valuable foal and was carrying another. Even if we assume the mare was infertile, there is no evidence to indicate that Mrs. Forbis knew or should have known of this condition at the time of sale. Mrs. Reilly's counsel admits in the brief opposing summary judgment that:

> In the Arabian horse business, and most probably likewise with the sale of any brood mare, the condition of infertility is not readily noticeable. It may take months of attempts to breed a horse before it becomes apparent that a horse cannot carry a fetus. Industry custom in the Arabian horse business dictates that only after a mare fails to conceive for an extended period of time will a more drastic step of the "uterine biopsy" be taken.

(Defendant Reilly's brief, at pp. 22–23, footnote omitted). The uterine biopsy was conducted in late March 1983, four months after the sale and after repeated efforts to breed the mare. Even then the veterinarian did not indicate that Il Shirin was infertile. We conclude therefore that there is no evidence from which a factfinder could conclude that Il Shirin was infertile at time of sale or that Mrs. Forbis knew or should have known of the condition of infertility.

■ We also note that Mr. Reilly testified that Mrs. Forbis told him that Il Shirin was "a good mare to start a breeding program with."[2] In a warranty context, such

---

**2.** Mrs. Forbis denies this allegation but for purposes of this motion we resolve all factual disputes in favor of the party opposing the motion.

a general statement of a horse's quality amounts to no more than puffing. See, *Sessa v. Riegle*, 427 F.Supp. 760 (E.D.Pa. 1977) (statement that horse is "sound" is mere puffing); *Walker v. Kirk*, 72 Pa.Super. 534 (1919); *Wilkinson v. Stettler*, 46 Pa.Super. 407 (1911); But see *Norton v. Lindsay*, 350 F.2d 46 (10th Cir.1965). Nor is it a statement actionable as fraud. *Berkebile*, 462 Pa. at 103, 337 A.2d 893.

Furthermore, placing this remark in context makes clear that it is no more than a reiteration of the other alleged misrepresentations discussed above. As Mr. Reilly tells it in his deposition:

A. I think [Mrs. Forbis] mentioned to me that it is not a high quality mare, in terms of her other mares, but she sells them for much higher prices, but it would be a good mare to start your breeding program with, to get started with.

Q. Did she tell you why it was not a high quality mare?

A. No. No, but older, and she—it was an older mare, but you could get foals out of it. It just had a colt.

(T. Reilly's depo. at p. 16). In short this separate alleged misrepresentation is simply the sum of the first two—that the horse was cheap and could reproduce. We rejected those alleged misrepresentations above and the same rationale is applicable here.

We therefore conclude that Mrs. Reilly has failed to identify any actionable statements or other conduct by Mr. and Mrs. Forbis which would sustain a claim of fraudulent misrepresentation with respect to Il Shirin. Summary judgment will be entered in favor of Mr. and Mrs. Forbis on Count III of Mrs. Reilly's counterclaim.

### 2) Ansata Abu Halim

A year after the purchase of Il Shirin, Mrs. Reilly decided to purchase a colt to develop as a breeding stallion. It was Mrs. Reilly's hope that she could purchase a colt who would ultimately be the foundation stallion of her herd.

For this reason Mrs. Reilly traveled to Ansata in April 1983 with her professional trainer William Rodgers. There they examined 2 yearling colts that Mrs. Forbis had for sale, and they preferred Ansata Abu Halim. During their examination of the colt Mrs. Reilly and her trainer noted a bit of white around the horse's eyeball, and discussed it with Mrs. Forbis. Mrs. Reilly dismissed this as minor and decided to purchase the colt at the asking price of $150,-000.

A written contract was prepared and signed. The agreement provided for a down payment of $45,000 and two subsequent annual installments of $52,500 plus interest. Mrs. Reilly made the down payment and the first installment. In a letter to Mrs. Forbis accompanying the first installment payment on April 5, 1984, Mrs. Reilly stated that Ansata Abu Halim was "without doubt the most exciting horse in our barn."

The excitement didn't last. The white pigmentation around the horse's eye did not diminish, leaving it with an undesirable condition described here as "human eye". Also at 3 years of age, Ansata Abu Halim developed a pigmentation problem in his skin, a condition that was not apparent earlier. Mrs. Reilly also claimed in this suit that the stallion was impotent but this claim has now been dropped.

Because of the problems with the horse Mrs. Reilly refused to make the final installment payment of $52,500 plus interest due April, 1985. Plaintiffs have sued for the balance due. In response Mrs. Reilly filed a Counterclaim charging Mrs. Forbis with making fraudulent misrepresentations which induced Mrs. Reilly to enter the contract. Also, Mrs. Reilly's counsel belatedly asserts a breach of warranty theory which is not pled but which appears first in the brief in opposition to summary judgment. Mrs. Reilly seeks rescission and damages for fraud.

We first address the tardily advanced warranty claim. Mrs. Reilly asserts that Mrs. Forbis created express warranties concerning Ansata Abu Halim at the time of sale, but even Mrs. Reilly and her counsel have been unable to state just what was warranted. Mrs. Forbis' alleged

statement that Ansata Abu Halim was one of her top 3 colts, or that he was active and graceful, is hardly a warranty. Furthermore, the sales agreement contains a bold-face disclaimer of warranties in accord with the Arkansas version of the Uniform Commercial Code, Ark.Stat.Ann. § 85–2–316.[3] The sales agreement contains only a limited warranty of fertility which is no longer pertinent in this case.

We conclude therefore that there are no warranties, express or implied, written or oral, concerning Ansata Abu Halim other than those provided in the written sales agreements. Mrs. Forbis is therefore entitled to summary judgment on the warranty claims.

■ We turn then to the fraud allegations. The alleged misrepresentations are these:

—That this colt was one of the finest ever bred at Ansata;

—That this colt was perfect for use as a foundation stallion;

—That the white around the eye, the so called "human eye", would "fill in" as the horse matured.

Clearly, the first two are no more than puffing. Opinions of comparative value or quality are ordinarily not actionable as fraud in Pennsylvania. E.g. *United States v. Goldberg*, 158 F.Supp. 544 (E.D.Pa.1958); *Berkebile*, 462 Pa. 83, 337 A.2d 893.

As to Mrs. Forbis' assurance that the white around the eye would "fill in", the deposition transcripts of Mrs. Reilly and her trainer make clear that this statement was not made to Mrs. Reilly. From Mrs. Reilly's deposition:

Q. Did you conduct any inspection of the horse yourself?

A. Just a visual one, you know, I liked the way the horse looked at the time.

Q. Now, can you tell me everything that you remember that Judy Forbis said about this horse, Abu Halim, before you bought it?

A. Well, she said it was one of the top three colts that it had ever produced. She said she had opportunities to see it in the field with the other weanlings and yearlings, and it outshone the other yearling crop by far. That it was one of top three colts she had ever produced.

Q. Have you heard Mr. Rodgers, your trainer, this morning say that he could see that the horse's eye was white?

A. Yes. I—at the time, I didn't think a lot of it. I didn't think that that was a terrible flaw at the time.

Q. You could see it, though?

A. I could see the white of the eye, yes.

Q. You know it was a yearling colt that you were buying for 150,000?

A. Yes, I knew.

Q. Did you know that there were any risks in buying the horse?

A. If there were risks, I thought they would be minimal. Whatever the risks would be, I think the worst risk would have been death of the horse. I didn't think in terms of other things, no.

Q. Do you remember anything else that Judy Forbis said about this horse before it was purchased?

A. Nothing, just that it was a fine, fine colt. I was buying her program, that she was aware of other mares I had purchased. She had thought that they would cross over real well, the pedigree. I had some pure bred Babson mares, and I do remember when I bought those particular mares off Babson, he recommended Ansata. Just as I am talking, I remember it, that that crosses real well with the Ansata bloodline. So I had a lot of good reasons at the time for buying an Ansata horse.

(B. Reilly depo. at pp. 57–58).

And the trainer, Mr. Rodgers, testified at deposition:

Q. Now, you said that you noticed and asked a question about white pigmentation around the eyes of the horse?

---

**3.** The sales agreement provides that Arkansas law applies.

A. Yes, I did.

Q. Was that something, do you know, that Mrs. Reilly was aware of before the purchase?

A. I don't know.

Q. But you asked Mrs.—you were aware about it before the purchase?

A. I looked at it. I wondered what the situation was.

Q. And the only thing that you can remember about that is that Mrs. Forbis told you that the horse would fill in?

A. That it would fill in, yes.

(Rodgers depo. at p. 41).

In order to prevail on a claim of fraudulent misrepresentation, a party must establish that he relied on the misrepresentation and that his reliance was justified. E.g. *DuSesoi v. United Refining Co.,* 549 F.Supp. 1289 (W.D.Pa.1982). While a buyer is not ordinarily required to undertake investigation, he may not blindly rely on the representations of the seller but must exercise common diligence and ordinary prudence. *Emery v. Third National Bank,* 314 Pa. 544, 171 A. 881 (1934). Most importantly, when a buyer discovers a defect, he may be expected in the exercise of common diligence and ordinary prudence to conduct some further inquiry. *Love v. Metropolitan Life Insurance Co.,* 99 F.Supp. 641, 643 (E.D.Pa.1951).

From the record as a whole, and in particular the portions cited above, we conclude that there is no evidence that Mrs. Reilly relied on Mrs. Forbis' assurance that the white around the eye would "fill in" because there is no evidence that this statement was communicated to Mrs. Reilly before she agreed to purchase the colt. Furthermore, even though Mrs. Reilly noted the white around the eye and recognized it as a defect, she dismissed it out of hand without any further inquiry despite the fact that she had a veterinarian on retainer and professional trainers in her employ.

Mrs. Reilly's protestations of naivete in such dealings are unavailing. Mrs. Reilly admits to having had an interest in Arabian horses for years, having attended seminars, sales and auctions and having read widely on the business of breeding Arabian horses of the Egyptian strain. She had begun a breeding farm with a tremendous financial investment and aspirations of national prominence. Before buying Ansata Abu Halim she had already purchased 9 horses for a total price of a $375,000. On at least one occasion she had attended an auction alone and purchased a mare for breeding.

Undisputably then Mrs. Reilly was not a novice and may not avail herself of the indulgence provided to one in a disadvantageous position in a business transaction. *Siskin v. Cohen,* 363 Pa. 580, 70 A.2d 293 (1939). The court may take into account the nature and experience of the claimant in assessing the level of diligence and prudence expected of him. Mrs. Reilly was calling the shots in a multi-million dollar enterprise and was committing to the expenditure of $150,000 for a yearling colt, in a business she had studied and prepared for over several years, and she cannot now be heard to claim that she was utterly dependent on the word of the seller. Even if this were true such blind reliance would be unreasonable in a transaction of this type and price. In addition Mrs. Reilly had at her disposal professional trainers and veterinarians and persons knowledgeable about Arabian horses and her failure to make even a single phone call when she had knowledge of the defect is clearly a lack of diligence. In short we conclude that there is no evidence to permit a jury to conclude that Mrs. Reilly exercised common diligence and ordinary prudence under the circumstances and therefore her professed reliance is unjustified.

Mrs. Reilly also complains quite strenuously that as Ansata Abu Halim matured, he displayed a severe pigmentation loss in his skin. Mrs. Reilly claims that this condition was fraudulently concealed at the time of sale. However, Mrs. Reilly and her trainer admit that this condition was not apparent at time of sale, that they did not examine the horse for this condition at time of sale, and that the condition first became apparent at least a year after the sale. (Rodgers depo. at pp. 44–47, 51; B. Reilly

depo. at 67, 71–73). Clearly there is no evidence that at the time of sale Mrs. Forbis knew or should have known that Ansata Abu Halim had a pigmentation loss, and thus there can be no fraudulent misrepresentation.

For the reasons stated summary judgment will be entered in favor of Mr. and Mrs. Forbis and against Mrs. Reilly on all claims concerning Ansata Abu Halim.

### 3) Ansata Nahema

Mrs. Reilly had no complaints about the mare Ansata Nahema but she withheld payments on this horse because of her dissatisfaction with Il Shirin and Ansata Abu Halim. Because we have resolved all claims concerning Il Shirin and Ansata Abu Halim in favor of plaintiffs and against Mrs. Reilly, Mrs. Reilly has no claim for set-off against Ansata Nahema.

Mr. and Mrs. Forbis sought to take possession of Ansata Nahema in lieu of the balance due and we permitted repossession upon posting a $300,000 replevin bond. With our resolution of all claims in favor of plaintiff the bond may be released.

Plaintiffs seek attorney's fees and costs pursuant to the Uniform Commercial Code provisions concerning repossession of collateral. It is not clear to us that plaintiffs are entitled to any award of fees and costs, but in any event plaintiffs have failed to provide any statement of the costs and fees attributable to repossession. If plaintiffs wish to persist in their claim for fees and costs they shall file an appropriate petition, with a brief and a verified itemized statement of such fees and costs, and defendant Reilly shall file a Response to the Petition, within the time specified in the accompanying Order.

### CONCLUSION

For the reasons stated above we conclude that summary judgment must be entered in favor of Mr. and Mrs. Forbis and against Mrs. Reilly on all claims and counterclaims.

An appropriate order will be entered.

### ORDER

AND NOW, in accord with the accompanying Opinion, it is hereby ORDERED:

1) Summary judgment is ENTERED in favor of plaintiffs-Forbis and against defendant-Reilly on all claims and counterclaims.

2) JUDGMENT is ENTERED in favor of plaintiffs-Forbis on Count I of the Complaint in the amount of $52,500 plus interest.

3) JUDGMENT is ENTERED in favor of plaintiffs-Forbis on Count II of the Complaint, but plaintiffs have agreed to take possession of Ansata Nahema in lieu of the balance due.

4) In consideration of judgments entered in favor of plaintiffs-Forbis on all claims and counterclaims, the replevin bond is RELEASED.

5) Any petition for fees and costs, with brief and a verified itemized statement of such fees and costs shall be filed on or before May 10, 1988. Defendant Reilly's Response and Brief shall be filed on or before May 20, 1988.

6) The CLERK is DIRECTED to mark this matter CLOSED.